CHRISTOPHER J. CHRISTIE
United States Attorney
SUSAN HANDLER-MENAHEM
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
Tel. 973-645-2907
U.S. Attorney's Office
SHM7714

*UNITED STATES DISTRICT COURT*
*DISTRICT OF NEW JERSEY*

| | |
|---|---|
| ADAM M. FINKEL, <br><br> *Plaintiff(s)*, <br><br> v. <br><br> U.S. DEPARTMENT OF LABOR, AND OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, <br><br> *Defendant(s)*. | HON. HON. MARY L. COOPER <br><br> *Civil Action No.* 05-5525 |

---

## BRIEF OF DEFENDANTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND DISMISSAL OF THE OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

---

CHRISTOPHER J. CHRISTIE
United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102

*On the Brief:*
SUSAN HANDLER-MENAHEM
Assistant United States Attorney

Edward Waldman
U.S. Department of Labor, Office of the Solicitor

TABLE OF CONTENTS

Table of Authorities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Preliminary Statement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Local Rule 56.1 Statement of Undisputed Facts . . . . . . . . . . . . . . . . . . . . . .  3

    Plaintiff's Two FOIA Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    Mandatory Pre-Disclosure Notification Process  . . . . . . . . . . . . . . . . . . . .  5

    DOL'S Disclosures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    The Inspection Sampling Data at Issue . . . . . . . . . . . . . . . . . . . . . . . . .  7

    The CSHO ID Numbers at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

    THE BeLPT Data at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Argument


    DOL Has Provided Plaintiff With Proper Production Under The FOIA and
    Therefore is Entitled to Summary Judgment . . . . . . . . . . . . . . . . . . . . . .  13

    A.    The Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

    B.    DOL has properly withheld, under FOIA exemption 4, the names
        and addresses of the employers from which each sample was
        obtained, and other potentially identifying information, to protect
        trade secrets and confidential commercial information.  . . . . . . .  15

        i.    Employers voluntarily submit to OSHA inspections, and do
            not ordinarily release to the public the identity of
            substances present at their facilities.  Therefore, the site-
            specific sampling data collected by OSHA is confidential and
            exempt from disclosure  . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

ii.      Even if the site-specific inspection sampling data does not qualify as "confidential" under the "voluntary" standard, it does qualify under the more rigorous "mandatory" standard, because its disclosure would impair both the reliability of sampling data obtained by OSHA in the future, and OSHA's administrative efficiency and effectiveness  . . .   19

iii.    Even if the site-specific sampling data is not "confidential commercial information," the data includes trade secrets that cannot reasonably be segregated; DOL therefore may withhold all the site-specific sampling data. . . . . . . . . . . .  21

iv.    Disclosure of either the inspection ID number, OSHA Office ID number, or the specific day on which an inspection occurred, could, combined with other publicly available information, permit identification of the employer that yielded the sample, thus disclosing trade secrets and/or confidential commercial information. . . . . . . . . . . . . . . . . .  23

C.      DOL properly withheld CSHO ID numbers under FOIA exemptions 7(C), (E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

(i)    DOL properly withheld CSHO ID numbers under exemption 7(C) to protect the personal privacy of its CSHOs  . . . . . . .  25

(ii)    DOL properly withheld CSHO ID numbers under exemption 7 (E) to preclude the compilation of CSHO profiles that would reveal techniques or procedures used for law enforcement investigations or prosecutions  . . . . . . . . . . .  27

D.      DOL properly withheld the "coded ID numbers" of OSHA employees who received the Beryllium Lymphocyte Proliferation Test (BeLPT) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

TABLE OF AUTHORITIES

CASES

*9 to 5 Organization for Women Office Workers v. Board of Governors of the*
*Federal Reserve System,*
   721 F.2d 1 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16, 17, 19

*Am. Airlines, Inc. v. Nat'l Mediation Bd.,*
   588 F.2d 863 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*Church of Scientology of California v. Internal Revenue Service,*
   792 F. 2d 146 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*Cooper Cameron Corp. v. United States Dep't of Labor,*
   280 F.3d 539 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n,*
   975 F.2d 871 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . .   15-17, 19

*Davin v. United States Dep't of Justice,*
   60 F.3d 1043 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*Flightsafety Services Corp. v. United States Dep't of Labor,*
   326 F.3d 607 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*Hale v. United States Dep't of Justice,*
   973 F.2d 894 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26, 27

*John Doe Agency v. John Doe Corp.,*
   493 U.S. 146 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 21

*Landano v. United States Dep't of Justice,*
   956 F.2d 422 (3d Cir. 1992),
   *vacated on other grounds,* 508 U.S. 165 (1993) . . . . . . . . . . . . . . . . . . .   14, 25

*Manna v. United States Dep't of Justice*,
    51 F.3d 1158 (3d Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 25

*Marshall v. Barlow's, Inc.*,
    436 U.S. 307 (1978)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*McDonnell Douglas Corp. v. United States Dep't of the Air Force*,
    375 F.3d 1182 (D.C. 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*McDonnell Douglas Corp. v. United States Equal Employment Opportunity Comm'n*,
    922 F. Supp. 235 (E.D. Mo. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . .  18

*McDonnell v. United States*,
    4 F.3d 1227 (3d Cir. 1993)  . . . . . . . . . . . . . . . . . . . . . . . . .  25, 28, 29

*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*National Parks & Conservation Ass'n v. Morton*,
    498 F.2d 765 (D.C. Cir. 1974)  . . . . . . . . . . . . . . . . . . . . . . . .  15, 16, 19

*Nix v. United States*,
    572 F.2d 998 (4th Cir. 1978)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26

*OSHA Data/CIH, Inc. v. United States Dep't of Labor*,
    220 F.3d 153 (3d Cir. 2000)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 15

*Public Citizen Health Research Group v. United States Food and Drug Administration*,
    704 F.2d 1280 (D.C. Cir. 1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Rugiero v. United States Dep't of Justice*,
    257 F.3d 534 (6th Cir. 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Sheet Metal Workers v. United States Dep't of Veterans Affairs*,
    135 F.3d 891 (3d Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*Solar Sources, Inc. v. United States*,
    142 F.3d 1033 (7th Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*United States Dep't of Defense v. Federal Labor Relations Authority*,
    510 U.S. 487 (1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*United States Dep't of Justice v. Reporters Committee for Freedom of the Press*,
    489 U.S. 749 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 25, 27

STATUTES

5 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

5 U.S.C. § 552(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

5 U.S.C. § 552(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

5 U.S.C. § 552(b)(1)-(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

5 U.S.C. § 552(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 13, 15

5 U.S.C. § 552(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 13, 28

5 U.S.C. § 552(b)(7)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 13, 24

5 U.S.C. § 552(b)(7)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 13, 25, 28

5 U.S.C. § 552(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

5 U.S.C. § 552(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

5 U.S.C. § 552a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

5 U.S.C. § 552a(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

29 U.S.C. § 651(b)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 18

29 U.S.C. § 657 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

29 U.S.C. § 666(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 18

REGULATIONS

29 C.F.R. § 70.26(b)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 23

29 C.F.R. § 70.26(d)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

29 C.F.R. § 70.26(h)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

29 C.F.R. § 1903.4   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

29 C.F.R. § 1903.6   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 18

29 C.F.R. § 1910.1000   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

RULES AND OTHER AUTHORITIES

F.R.Civ.P. 56(c)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

PRELIMINARY STATEMENT

Plaintiff Adam M. Finkel brought this action against the United States Department of Labor ("DOL") and the Occupational Safety and Health Administration ("OSHA") (a component of DOL) under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for production of records requested in two separate FOIA requests.[1]  The first request, which had three components, sought:  (i) all inspection sampling data compiled by the OSHA between 1979 and 2005, where the substance sampled was beryllium; (ii) the results of medical tests undergone by OSHA employees for beryllium sensitization; and (iii) any analyses OSHA had undertaken regarding the cumulative beryllium exposure of its employees.  The second request sought all inspection sampling data compiled by OSHA between 1979 and 2005.

The Department of Labor ("DOL") disclosed two batches of responsive records to plaintiff.  On or about September 29, 2006, DOL disclosed to plaintiff all responsive records regarding inspection sampling (beryllium and otherwise), stripped of any information that would identify, or help identify, the employer from whom the sample was taken or the Compliance Safety and Health Officer ("CSHO") who obtained the sample.  On or about October 5, 2006, DOL disclosed to plaintiff the results of the medical tests undergone by OSHA employees for beryllium sensitization, but DOL substituted randomly-assigned identification numbers for the "coded ID numbers" of the tested employees.  DOL has not undertaken any analyses of the cumulative exposure of its employees to beryllium, and therefore has no records responsive to that aspect of plaintiff's FOIA requests.

---

[1] The only proper defendant in a FOIA action is the "agency" as defined by 5 U.S.C. § 552(f), here the United States Department of Labor.  Accordingly, OSHA is not a proper defendant and should be dismissed.

1

DOL's withholding of the records described above was proper under FOIA.  DOL properly withheld under FOIA exemption 4 the names and addresses of the employers that yielded the inspection samples, and other information that could help identify the employers that yielded the samples.  5 U.S.C. § 552(b)(4).  Exemption 4 protects trade secrets and confidential commercial information.  *Id.*  The identity of the substances present in employers' facilities qualifies as a trade secret or confidential commercial information.  Under FOIA exemption 7(C), which protects the personal privacy of individuals mentioned in law enforcement records, DOL properly withheld CSHO identification numbers.  5 U.S.C. § 552(b)(7)(C).  Disclosure of CSHO ID numbers could violate their personal privacy and subject them to possible harassment on the job.  FOIA exemption 7(E) also justifies DOL's withholding of the CSHO ID numbers, because disclosure could permit the compilation of CSHO profiles that reveal law enforcement techniques or procedures.  5 U.S.C. § 552(b)(7)(E).  Finally, DOL properly withheld the "coded ID numbers" of OSHA employees who underwent medical testing for beryllium sensitization under FOIA exemption 6.  Exemption 6 protects information in personnel, medical, or similar files where disclosure would result in a clearly unwarranted invasion of personal privacy.  5 U.S.C. § 552(b)(6).  Disclosure of the results of OSHA employees' medical tests, together with "coded ID numbers" consisting of the last four digits of their Social Security numbers, would violate their privacy.

Accordingly, DOL moves for summary judgment.

2

LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

<u>PLAINTIFF'S TWO FOIA REQUESTS</u>

1.  By letter dated June 28, 2005, plaintiff requested, pursuant to FOIA:

(i) "All sampling records from OSHA's Salt Lake City Technical Center's analytical

database, beginning on or about between June 1, 1979 and extending to June 1, 2005, where

beryllium . . . was analyzed.  Each record should either contain information from all of the fields

present in the database, or at OSHA's option, the information from at least the following fields:

- Date of sample
- Office ID number
- Inspection ID number
- CSHO [Compliance Safety and Health Officer] ID number
- Establishment name and address
- Sample type (personal, area, bulk, wipe, etc.)
- Sample result
- Sample units (ppm, ug/m3, percent, etc.)
- Duration of sampling (in minutes)"

(ii) "A list of the coded ID numbers of all OSHA employees who received the Beryllium

Lymphocyte Proliferation Test (BeLPT) [for sensitization to beryllium] since January 1, 2004 (I

understand that this list will contain at least 300 entries), with the test result (positive or negative)

indicated with each ID number.  In the alternative, I request the test results themselves, with all

personally-identifying information except for the coded ID number redacted." (Footnote omitted.)

(iii) "The results of any analyses OSHA has undertaken, using either in-house or contractor

resources, to estimate the cumulative exposures of any of its employees to beryllium, including

but not limited to any analyses comparing the cumulative exposures (and/or the number of

3

facilities an inspector entered where beryllium was found) of employees who have tested positive

for sensitization to those who have tested negative and those who have not been tested."

Complaint ¶ 5; Complaint Exhibit ("Ex.") 1; Answer ¶ 5.

     2.  By letter dated August 12, 2005, plaintiff made the second FOIA request at issue in this

case, requesting:  "all sampling records from OSHA's Salt Lake City Technical Center's analytical

database, beginning on or about June 1, 1979 and extending to June 1, 2005.  Each record should

either contain information from all of the fields present in the database, or at OSHA's option, the

information from at least the following fields:

- Date of sample
- Office ID number
- Inspection ID number
- CSHO ID number
- IMIS [Integrated Management Information System] analyte number
- Establishment name and address
- Sample type (personal, area, bulk, wipe, etc.)
- Sample result
- Sample units (ppm, ug/m3, percent, etc.)
- Duration of sampling (in minutes)"

Complaint ¶ 9; Complaint Ex. 3; Answer ¶ 9.  Plaintiff admitted that this request "may involve

upwards of 1 million individual industrial hygiene records."  Complaint Ex. 3.

     3.  Not having received a substantive response to either of his FOIA requests, plaintiff

filed administrative FOIA appeals of each request, dated August 12, 2005 and September 20,

2005, respectively.  Complaint ¶¶ 7, 11; Complaint Exs. 2, 4; Answer ¶¶ 7, 11.  DOL did not

timely respond to either of plaintiff's two FOIA appeals.  Complaint ¶¶ 8, 12; Answer ¶¶ 8, 12.

Plaintiff filed his complaint, which included a request for a fee waiver with respect to both FOIA

requests, Complaint ¶ 16, on November 22, 2005.  DOL filed its answer on January 17, 2006.

DOL has since agreed to grant plaintiff's fee waiver request.

<u>MANDATORY PRE-DISCLOSURE NOTIFICATION PROCESS</u>

4.  As required by 29 C.F.R. § 70.26(h) and Executive Order 12600, on April 21, 2006,

OSHA published in the Federal Register a notice of the plaintiff's lawsuit and underlying FOIA

requests.  71 Fed. Reg. 20732 (Apr. 21, 2006).[2]  The notice solicited "comments from affected

employers in order to determine whether public release, in a form that identifies specific

employers or workplaces, of sampling data that indicates chemical identities and the use or

presence of particular chemicals or substances, would disclose confidential commercial or trade

secret information."  *Id.*  Additionally, on the same date, OSHA sent similar letters to one

employer, and 19 trade associations representing nearly 3.7 million employers, notifying them of

the lawsuit and underlying FOIA requests, and soliciting their comments.  Declaration of Kevin

Ropp ("Ropp decl."), ¶1.

5.  OSHA received responses from ten employers, nine trade associations representing

approximately 3,385,000 member employers, one individual who did not state his interest in the

matter, and the AFL-CIO.  Ropp decl. at ¶2.[3]  All ten employers and eight of the nine trade

---

[2] When DOL has reason to believe a FOIA request seeks "confidential commercial information," DOL must provide the submitter(s) of the information notice of the FOIA request and an opportunity to object to disclosure of the information requested.  29 C.F.R. § 70.26(d), (e); Executive Order 12600; *see OSHA Data/CIH, Inc. v. United States Dep't of Labor*, 220 F.3d 153, 163 (3d Cir. 2000).  Similarly, whenever a FOIA requester brings a lawsuit seeking to compel disclosure of "confidential commercial information," DOL must notify the submitter(s).  29 C.F.R. § 70.26(h); Executive Order 12600.

[3] All the comments received are attached as exhibits to the Ropp declaration, and posted on OSHA's public website at http://dockets.osha.gov/search/browseDockets.asp (click on "browse" all dockets, then on "Notice of Lawsuit – Solicitation of Information (FOI-001)").

associations objected, for a variety of reasons, to release of sampling data in a form that identifies

specific employers or worksites. *Id.* at ¶3. All the objectors except one mentioned that disclosure

of the records plaintiff requested would reveal trade secrets and/or confidential commercial

information. *Id.*[4] Additionally, one employer and three trade associations, which together

represent approximately 3,225,000 employers, threatened that if OSHA releases the sampling data

at issue, employers would be less cooperative with OSHA inspectors in the future, and might

force OSHA to obtain search warrants before conducting inspections. *Id.* at ¶5.

<u>DOL'S DISCLOSURES</u>

6. On or about September 29, 2006, DOL released to plaintiff the inspection sampling

data plaintiff requested, except it withheld the:

(i) employers' names and addresses;

(ii) day (as opposed to the month and year, which were provided) of the inspections;

(iii) inspection ID numbers;

(iv) OSHA Office ID numbers;

(v) CSHO ID numbers.

7. On or about October 5, 2006, DOL released to plaintiff the BeLPT results plaintiff

requested, except DOL substituted randomly-assigned ID numbers for the "coded ID numbers" of

the OSHA employees who underwent the BeLPT. The "coded ID numbers" consist of the last

---

[4] The one trade association that did not mention trade secrets or confidential commercial information, the Associated Builders and Contractors, Inc., objected to disclosure on due process grounds, arguing that OSHA should notify each individual employer and afford at least sixty days for a response. Ropp decl., ¶ 4. The individual who did not identify his interest in the matter made a similar point. *Id.* The AFL-CIO, which was not a submitter of information covered by plaintiff's FOIA requests, supported disclosure. *Id.*

four digits of the OSHA employee's Social Security number.  Declaration of Donald Wright ("Wright decl.), ¶ 3.


## THE INSPECTION SAMPLING DATA AT ISSUE

8.  OSHA health standards establish exposure limits for over 500 air contaminants that are considered toxic substances because they can cause illness or death.  *E.g.*, 29 C.F.R. § 1910.1000, Table Z-1; *see also* Declaration of Richard Fairfax ("Fairfax decl."), ¶ 5.  When OSHA conducts an inspection and has reason to believe that employees at the facility might be exposed to toxic substances, the inspection includes the collection of samples to determine the extent to which employees are exposed to toxic substances.  Fairfax decl., ¶ 5.  Advance notice of inspections may not be given.  29 U.S.C. §§ 651(b)(10), 666(f); 29 C.F.R. § 1903.6.  There are over one million samples, taken during the course of approximately 73,000 inspections, responsive to plaintiff's FOIA requests.  Declaration of Keith Motley ("Motley decl."), ¶ 7; Declaration of Cathryn Goedert ("Goedert decl."), ¶ 5; Complaint Ex. 3.  After OSHA collects samples of substances, it sends them to its Salt Lake City Technical Center in Utah, which analyzes them for the presence of toxic substances.  Fairfax decl., ¶ 7; Motley decl., ¶ 2.  The Center's database does not include sampling data pre-dating 1984.  Goedert decl., ¶ 2.  OSHA's Integrated Management Information System ("IMIS") database, however, contains the pre-1984 sampling data.  *Id.* at ¶ 3; *see also* Declaration of Bruce Beveridge ("Beveridge decl."), ¶ 2.

9.  In less than 2% of OSHA inspections involving sampling, the employers designated one or more samples as containing trade secrets.  Fairfax decl., ¶ 6; *see* 29 C.F.R. § 70.26(b) ("Designation of confidential commercial information.").  Neither the Salt Lake City Technical

Center's database, nor any other OSHA database, contains these trade secret designations.  Fairfax

decl., ¶ 7.  To determine whether an employer designated a particular sample as a trade secret or

confidential commercial information would require OSHA to examine all of the approximately

73,000 enforcement case files that correspond to the samples responsive to plaintiff's FOIA

requests.  *Id.*

10.  To do so, OSHA would initially have to expend substantial time and resources just to

obtain access to many of the case files.  *Id.* at ¶¶ 9, 10.  Under OSHA's record management plan,

area offices must transfer enforcement case files containing sampling data to the appropriate

National Archives and Records Administration ("NARA") Federal Records Center three years

after the closing of the case.  *Id.* at ¶ 9.[5]  Because the instant FOIA requests cover sampling data

dating back to 1979, the overwhelming majority of the relevant enforcement case files have been

closed for more than three years.  Fairfax decl., ¶ 10.  Thus, to review these files, OSHA would

have to either request that NARA ship the files back to the OSHA area offices, or arrange for

OSHA personnel to travel to the records centers.  *Id.*  Once OSHA obtained all the files, the

examination of each file would range from minutes, to hours, to days, depending upon the size of

the file.  Fairfax decl., ¶ 8.  Assuming that review of each file takes only thirty minutes, it would

take OSHA approximately 36,500 hours, or 1,521 days, which is the equivalent of over six

employee work years (assuming there are 250 work days per year), to complete the review.  *Id.*

11.  Disclosure of the sampling data linked with specific employers would likely result in a

significant increase in the rate of employers insisting that OSHA obtain a search warrant before

---

[5] Area offices have discretion to retain files of "special interest," *e.g.*, ones in which they expect further activity.  Fairfax decl., ¶ 9.

allowing OSHA to conduct any inspection or sampling. Fairfax decl., ¶ 12. In approximately

1.4% of all OSHA inspections between 1979 and 2005, employers denied OSHA inspectors entry.

Beveridge decl., ¶ 4; *see also* Fairfax decl., ¶ 4 (estimating that OSHA obtained a search warrant

in less than approximately 2% of cases). Denials of entry (which do not necessarily mean OSHA

obtained a search warrant) are reflected in OSHA's IMIS database. Beveridge decl., ¶ 4. This

result would hurt OSHA's ability to advance its mission of protecting employee safety and health

in the following ways:

a) OSHA's ability to obtain accurate sampling data could be impaired. An employer who

insists on a warrant has time to prepare for the anticipated inspection. The employer could then

stop or change the process it normally uses in a way that temporarily eliminates or reduces the

amount of the toxic substances to which employees are normally exposed. In such cases, OSHA

would obtain a sample that is qualitatively different than the sample it would have obtained had

the employer consented to the inspection in the first instance.

b) OSHA's enforcement program could be impaired. Employers who temporarily stop or

change their normal processes could avoid detection of violations and thereby prevent OSHA

from issuing citations, which, in turn, would impair OSHA's ability to deter future violations.

c) OSHA's ability to protect the health and safety of employees could be impaired. In

cases where employers insist on a warrant but do not temporarily stop or change their normal

processes, employees would continue to be exposed to hazardous conditions for a longer period of

time than they would have been had the employer consented to the inspection in the first instance.

d) OSHA's ability to implement its inspection and enforcement program would be

undermined by the diversion of resources from conducting inspections to obtaining warrants.

Fairfax decl., ¶ 12(a) – (d).

12. Disclosure of the inspection ID numbers associated with the sampling data disclosed could allow easy identification of the employers from which the samples were obtained by cross-reference with the publicly available OSHA inspection database on the OSHA website (http://www.osh.gov/oshstats/index.html).  Fairfax decl., ¶ 17.  Similarly, by cross-referencing, one could identify the employer through the public IMIS database if one had the specific day (along with the month and year) of a particular inspection.  *Id.*  Release of the OSHA Office ID number would also allow cross-referencing.  *Id.* at ¶ 18.  The OSHA Office ID numbers are available on OSHA's public website (http://www.osha.gov/oshstats/index.html) (listed as the "Report ID number" on individual inspection reports.  A FOIA request for a list of all inspections conducted by a particular OSHA Office during a particular time period would provide the requester with a list of employers that could be matched with the list of samples disclosed in this case.  By comparing the list of employers inspected by a particular OSHA office in a particular month and year, to the list disclosed in this case of samples taken in a particular month and year could – if the latter also contained the OSHA Office ID number – allow the requester in many cases to "reverse engineer" which employers yielded which samples.  *Id.*

<div align="center">THE CSHO ID NUMBERS AT ISSUE</div>

13. The CSHO ID numbers requested by plaintiff are unique numbers that serve to distinguish and identify CSHOs.  Fairfax decl., ¶¶ 13, 15.  They are an integral part of a CSHO's identity.  *Id.* at ¶ 15.  In 2001, to better protect the privacy of CSHOs, OSHA changed the way it formulates CSHO ID numbers, substituting randomly-generated numbers for IDs that previously consisted of the CSHOs' initials and parts of their Social Security numbers.  *Id.* at ¶ 14.  OSHA

<div align="center">10</div>

uses the CSHO ID numbers as an internal management tool for reviewing and assessing the work activities of CSHOs. *Id.* at ¶ 13. CSHO ID numbers allow supervisors to monitor the amount of time CSHOs work; the safety and health standards they recommend for citations; and other work activities, such as providing telephone assistance to the public. *Id.* By allowing OSHA supervisors to assess the performance of CSHOs, the CSHO ID numbers enable OSHA to evaluate the strengths and weaknesses of its CSHOs, which, in turn, helps OSHA improve the quality of its training programs for CSHOs, and thereby improves the quality of OSHA inspections. *Id.*

14. Disclosure of CSHO ID numbers could have two undesirable results. *Id.* at ¶ 16. First, it could lead to a computerized profiling of a CSHO's proclivities to cite particular violations or higher penalties, thus enabling employers to be less cooperative with, or deny entry to, certain CSHOs. *Id.* Second, identification of CSHOs could lead to harassment of CSHOs on the job. *Id.*

## THE BeLPT DATA AT ISSUE

15. In April 2004, OSHA began a pilot medical monitoring program for its employees who potentially have been exposed to beryllium. Wright decl., ¶ 1. The pilot medical monitoring program is available to OSHA CSHOs on a voluntary basis. *Id.* at ¶ 2. The program includes notification to participating CSHOs of when, during an inspection in which they have participated, samples taken at the inspected facility found beryllium above the detectable level. *Id.* The CSHOs then determine whether they want to undergo testing. *Id.* When a CSHO elects to undergo the beryllium lymphocyte proliferation test (BeLPT) for beryllium sensitization, blood

11

is drawn by the U.S. Department of Health and Human Services' Federal Occupational Health Service ("FOH"). *Id.* at ¶ 3. FOH also assigns each employee tested a coded identification number consisting of the last four digits of the employee's Social Security number. *Id.* FOH sends the results of the medical testing to OSHA. *Id.* OSHA has not conducted, nor has it had anyone conduct on its behalf, any analysis to estimate the cumulative exposure of any of OSHA's employees to beryllium. *Id.* at ¶ 4. OSHA also has not conducted, nor has it had anyone on its behalf conduct, any analysis of the number of facilities an OSHA inspector entered where beryllium was found. *Id.*[6]

_____

[6] In this regard, DOL notes that the BeLPT program is a voluntary, pilot program. *Id.* at ¶¶ 1,2

**ARGUMENT**

DOL HAS PROVIDED PLAINTIFF WITH PROPER PRODUCTION UNDER THE
FOIA AND THEREFORE IS ENTITLED TO SUMMARY JUDGMENT

Under FOIA, a federal agency is required to produce all responsive, non-exempt
documents to a requester.  5 U.S.C. § 552(d).  DOL has records responsive to plaintiff's FOIA
requests consisting of:  (i) over one million samples of toxic substances collected during the
course of approximately 73,000 worksite inspections conducted by OSHA over a twenty-six year
period; and (ii) results of medical tests for beryllium sensitization taken by nearly 300 OSHA
employees since April 2004.  Complaint Exhibit 3; Goedert decl., ¶ 5; Motley decl., ¶ 7.  In
producing these responsive records to plaintiff, DOL properly withheld:  (i) information that could
identify the employer that yielded the sample, to protect trade secrets and/or confidential
commercial information; (ii) the CSHOs' ID numbers, both to protect the CSHOs' personal
privacy and to prevent the disclosure of law enforcement techniques and procedures; and (iii) the
"coded ID numbers" of the OSHA employees that took the beryllium sensitization tests, to protect
their personal privacy.  The applicable FOIA exemptions are 4, 7(C) and (E), and 6, respectively.
5 U.S.C. §§ 552(b)(4), (7)(C), (7)(E), (6).  Finally, DOL did not undertake any analyses to
estimate the cumulative exposure of any of its employees to beryllium, and therefore has no
records responsive to this aspect of plaintiff's FOIA request.  Wright decl., ¶ 4.  For these reasons,
described in detail below, DOL's motion for summary judgment should be granted.

A.  The Statutory Background

Review of an agency denial (or, as here, constructive denial) of a FOIA request is *de novo*.
5 U.S.C. § 552(a)(4)(B).  Most FOIA cases are resolved by motion for summary judgment.

*Flightsafety Services Corp. v. United States Dep't of Labor*, 326 F.3d 607, 610 (5th Cir. 2003).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Manna v. United States Dep't of*

*Justice*, 832 F. Supp. 866, 870 (D. N.J. 1993).  A genuine issue of material fact is one that could

change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

     The basic principle behind the FOIA is "public access to Government documents." *John*

*Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989); *see also Landano v. United States*

*Dep't of Justice*, 956 F.2d 422, 425 (3d Cir. 1992), *vacated on other grounds*, 508 U.S. 165

(1993).  "Public access to governmental information is not, however, 'all encompassing.'" *Sheet*

*Metal Workers v. United States Dep't of Veterans Affairs*, 135 F.3d 891, 897 (3d Cir. 1998).

Rather, FOIA "reflects a general philosophy of full agency disclosure *unless* information is

exempted under clearly delineated statutory language." *United States Dep't of Defense v. Federal*

*Labor Relations Authority*, 510 U.S. 487, 494 (1994) (emphasis added).  "Congress exempted

nine categories of documents from the FOIA's broad disclosure requirements." *United States*

*Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 755 (1989); 5

U.S.C. § 552(b)(1)-(9).  The records DOL has withheld in this case fall squarely within the

statutory exemptions.

**B.  DOL has properly withheld, under FOIA exemption 4, the names and addresses of the employers from which each sample was obtained, and other potentially identifying information, to protect trade secrets and confidential commercial information.**

Exemption 4 protects "trade secrets" and "commercial or financial information obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4). For purposes of the FOIA, a "trade secret" is narrowly defined as "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort."  *Public Citizen Health Research Group v. United States Food and Drug Administration*, 704 F.2d 1280, 1288 (D.C. Cir. 1983).  By contrast, the term "commercial or financial information" is broadly construed to cover "anything pertaining or related to or dealing with commerce," *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978). However, to qualify for protection under exemption 4, "commercial or financial information" must be "privileged or confidential."

The applicable legal standard for determining whether commercial information is "confidential" depends upon whether it was submitted to the government voluntarily or under compulsion.  *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878-79 (D.C. Cir. 1992); *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974).[7]  Where the information is provided voluntarily, it is "confidential" if the submitter does not ordinarily release the information to the general public.  *Id.*  The court in *Critical Mass* reasoned that the governmental interest underlying FOIA exemption 4 was in "ensuring [the]

---

[7] No other circuit court has explicitly endorsed or rejected the D.C. Circuit's distinction between these two categories of information.  In *OSHA Data*, 220 F.3d at 166 n. 30, the Third Circuit determined that, based on the facts of the case, it was unnecessary to apply this distinction.

continued availability" of that information.  975 F.2d at 878.  Disclosure of such voluntarily

submitted information under FOIA, the court stated, would likely lead submitters of the

information to "refuse further cooperation" with the government.  *Id.*

By contrast, where commercial information is provided to the government under

compulsion, a more rigorous standard must be met to establish that the information is

"confidential."  Commercial information submitted to an agency under compulsion is

"confidential" where disclosure is likely to: (1) impair the reliability of the information provided

to the government in the future; (2) cause substantial harm to the competitive position of the

person from whom the information was obtained; or (3) impair some other identifiable

governmental interest, such as administrative efficiency and effectiveness.  *Critical Mass*, 975

F.2d at 878-79; *9 to 5 Organization for Women Office Workers v. Board of Governors of the

Federal Reserve System*, 721 F.2d 1, 10 (1st Cir. 1983); *National Parks*, 498 F.2d at 770.  The

court in *Critical Mass* reasoned that the government has an interest in ensuring the "continued

reliability" of the submitted information, explaining that continued availability of the information

in such circumstances "is not threatened by disclosure because it secures the information by

mandate."  971 F.2d at 878.

As described in sections (i), (ii), and (iii), below, DOL advances three arguments for

withholding employers' names and addresses.  First, the "voluntary" standard applies, because

(with rare exceptions) employers did not insist on search warrants.  Applying the "voluntary"

standard, the commercial information at issue is "confidential" because employers do not

ordinarily disclose the identity of the substances present on-site to the general public.  *See Critical*

*Mass*, 975 F.2d at 879.  Second, even if the commercial information at issue is not "confidential"

16

under the "voluntary" standard, it is "confidential" under the more rigorous "mandatory" standard because its disclosure would likely impair both the reliability of samples obtained by OSHA in the future and OSHA's efficiency and effectiveness in executing its inspection program.  *See 9 to 5 Org.*, 721 F.2d at 10.  Third, even if the commercial information at issue is not "confidential" under either the "voluntary" or "mandatory" standard, it is intermingled with – and not reasonably segregable from – trade secrets that are entitled to unqualified protection.  Absent reasonable segregability, DOL may withhold all the site-specific sampling information.  Finally, as argued in section (iv) below, withholding employers' names and addresses is not enough to protect trade secrets and/or confidential commercial information.  DOL must also withhold the inspection ID numbers, the specific days on which inspections occurred, and OSHA office ID numbers, to prevent identification of the employers that yielded the samples at issue via reverse engineering.  Therefore, DOL also properly withheld those three types of information under exemption 4.

> ### i.  Employers voluntarily submit to OSHA inspections, and do not ordinarily release to the public the identity of substances present at their facilities.  Therefore, the site-specific sampling data collected by OSHA is confidential and exempt from disclosure.

Where commercial information is submitted to an agency voluntarily, it is "confidential" if the submitter does not ordinarily release the information to the general public.  *Critical Mass*, 975 F.2d at 872.  In *Critical Mass*, the records at issue were reports provided to the Nuclear Regulatory Commission ("NRC") by the Institute of Nuclear Power Operations ("INPO"), a non-profit corporation whose membership included all nuclear power plant operators in the United States, concerning the construction and operation of nuclear facilities.  975 F.2d at 874.  While INPO was not subject to NRC regulation, its members were; therefore the NRC could compel

them to produce the reports. *Id.* The court held the INPO records to have been voluntarily submitted despite the fact that the agency held the legal authority to require their submission. 975 F.2d at 880. The court reasoned that the agency had not in fact exercised that authority. *Id.*

The court flatly rejected the idea that an agency's unexercised "power to compel" the submission of information precludes such information from being deemed "voluntary." 975 F.2d at 880. In so doing, the court stated that it would not "interfere" with an agency's "exercise of its own discretion in determining how it can best secure the information it needs." *Id.* Similarly, in *McDonnell Douglas Corp. v. United States Equal Employment Opportunity Comm'n*, 922 F. Supp. 235, 242 (E.D. Mo. 1996), the court held that documents submitted in response to an agency subpoena were voluntarily produced because the submitter did not challenge the subpoena.

OSHA's regulatory scheme recognizes that OSHA will generally conduct inspections on a consensual basis. *See* 29 C.F.R. § 1903.4 (procedures for when an employer objects to inspection); Fairfax decl., ¶ 4. Advance notice of an inspection may not be given. 29 U.S.C. §§ 651(b)(10), 666(f); 29 C.F.R. § 1903.6. Nevertheless, an employer has a right to insist upon a search warrant prior to inspection. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 325 (1978). Employers insist upon a warrant less than 2% of the time. Fairfax decl., ¶ 7.[8]

Establishments inspected by OSHA do not customarily release the identity of substances present to the general public. Rather, all the employers and eight of the nine trade associations that participated in OSHA's pre-disclosure notification process, *see* 71 Fed. Reg. 20732 (Apr. 21,

---

[8] OSHA's IMIS database reflects "denial of entry" (which does not necessarily mean OSHA obtained a search warrant) in approximately 1.4% of inspections conducted between 1979 and 2005. Beveridge decl., ¶2. The argument in this section does not apply to those cases in which OSHA conducted inspections pursuant to a warrant. Rather, the argument in section (B)(ii) below applies in such cases.

2006), opposed disclosure of site-specific sampling data. *See* Ropp decl., ¶ 3. As their objections

indicate, employers do not ordinarily release the identity of the substances present on-site to the

general public.

In sum, the site-specific sampling data voluntarily provided to OSHA is "confidential"

commercial information protected under exemption 4.

> ii. Even if the site-specific inspection sampling data does not qualify as
> "confidential" under the "voluntary" standard, it does qualify under the more
> rigorous "mandatory" standard, because its disclosure would impair both the
> reliability of sampling data obtained by OSHA in the future, and OSHA's
> administrative efficiency and effectiveness.

Even if OSHA inspections are considered mandatory, based on OSHA's statutory authority

to inspect workplaces, *see* 29 U.S.C. § 657, (or based on an employer's insistence that OSHA

obtain a search warrant prior to inspection) site-specific sampling data is nevertheless

"confidential," and therefore exempt from disclosure. Where commercial information is

submitted to an agency under compulsion, it is "confidential" if disclosure of the information is

likely to: (1) impair the reliability of the information provided to the government in the future; (2)

cause substantial harm to the competitive position of the person from whom the information was

obtained; or (3) impair some other identifiable governmental interest, such as administrative

efficiency and effectiveness. *Critical Mass*, 975 F.2d at 878-79; *9 to 5 Org.*, 721 F.2d at 10;

*National Parks*, 498 F.2d at 770. Site-specific sampling data meets the first and third prongs of

this test.

Disclosure of the substances present at specific establishments inspected by OSHA would

likely discourage those establishments from cooperating with OSHA inspectors, thus resulting in

an increase in the rate of employers' insistence of search warrants. Fairfax decl., ¶ 12. One employer and three trade associations, together representing more than 3,225,000 employers, threatened that disclosure would result in increased insistence on search warrants. Ropp decl., ¶ 5.

For OSHA to obtain a warrant could take days or even weeks. Fairfax decl., ¶ 12(c). During that time, employers could prepare by temporarily eliminating or reducing the amount of toxic substances to which employees are normally exposed, thus impairing the reliability of the information collected by OSHA. *Id.* at ¶ 12(a). Additionally, the efficiency and effectiveness of OSHA's inspections would be impaired. By temporarily eliminating or reducing the amount of toxic substances to which employees are normally exposed, employers could avoid citations, thus reducing overall compliance with OSHA standards. *Id.* at ¶ 12(b). Additionally, where the employer does not alter its processes and a citation is ultimately issued for overexposure, employees would be exposed to hazardous conditions for longer periods of time than if the employer had voluntarily submitted to inspection. *Id.* at ¶ 12(c). Moreover, insistence on warrants would increase the costs of OSHA's inspection program, thus reducing the number of inspections OSHA could do. *Id.* at ¶ 12(d).

In sum, disclosing site-specific sampling data would prompt employers to insist that OSHA obtain search warrants before inspections, thus impairing the reliability of the information obtained during, and the efficiency and effectiveness of, future OSHA inspections. The site-specific sampling data is therefore "confidential," and is properly withheld under exemption 4.

20

### iii.  Even if the site-specific sampling data is not "confidential commercial information," the data includes trade secrets that cannot reasonably be segregated; DOL therefore may withhold all the site-specific sampling data.

Even assuming that the site-specific sampling data fails to qualify as "confidential commercial information," DOL nevertheless need not disclose it.  The database requested includes trade secrets, which are unqualifiedly entitled to protection under exemption 4, and cannot reasonably be segregated from the other sampling data.  Fairfax decl., ¶¶ 6-11.

The FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  Thus, where a record contains both exempt and non-exempt material, an agency is required to disclose the non-exempt material only if it is "reasonably segregable."  *See, e.g., Davin v. United States Dep't of Justice*, 60 F.3d 1043, 1052-53 (3d Cir. 1995).  The agency bears the burden of proving that the withheld material is non-segregable, and must "provide a factual recitation of why certain materials are not reasonably segregable."  *Id.* at 1052; *see also Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1039 (7th Cir. 1998) (recognizing that "the statute makes clear that courts should not order segregation when such a process would be significantly unwieldy," and that "[i]mposing this burden upon the government, as well as the reviewing courts, would conflict with the 'practical approach' that courts have taken in interpreting the [FOIA].") (citing *John Doe Agency*, 493 U.S. at 157).

Less than approximately 2% of the samples at issue here were designated as trade secrets by the employers from whom OSHA obtained them.  Fairfax decl., ¶ 6.  All ten employers and eight of the nine trade associations that responded to OSHA's notice of the instant lawsuit and FOIA requests argued that disclosure of site-specific sampling data would reveal trade secrets.

Ropp decl. ¶ 3. For example, in strenuously objecting to disclosure of sampling data, the Acme Brick Company commented that "[w]e have spent 115 years developing our trade secrets on our product mixtures, raw materials, blends and additives that make up our finished goods." *See* Ropp decl. attachment at p.1 (copy attached to this brief for the convenience of the Court). The database plaintiff requested, however, does not contain those designations. Fairfax decl., ¶ 7. Rather, the individual case files contain the trade secret designations. *Id.* The FOIA does not require an agency to reorganize its files. "It is firmly established that an agency is not required to reorganize [its] files in response to [a plaintiff's] request in the form in which it was made." *Church of Scientology of California v. Internal Revenue Service*, 792 F. 2d 146, 150-51 (D.C. Cir. 1986).

To identify the samples designated as trade secrets, OSHA would have to search the approximately 73,000 case files that generated the 1 million-plus samples at issue. Fairfax decl. at ¶¶ 7-8. Initially, OSHA would need to expend significant time and resources just to obtain most of the files. *Id.* at ¶¶ 9-10. Under OSHA's record management plan, unless the case file is of "special interest," area offices must transfer enforcement case files containing sampling data to the NARA Federal Records Center within three years of closing the case. *Id.* at ¶ 9. Because the instant FOIA requests cover sampling data dating back to 1979, the overwhelming majority of the relevant enforcement case files have been closed for more than three years. *Id.* at ¶ 10. Thus, to review these files, OSHA would have to request the files from various federal records centers. *Id.*

Once OSHA obtained all the case files, it would take from minutes to hours to days for OSHA to review each file, depending upon its size. *Id.* at ¶ 8. Even if OSHA spent only one half-hour reviewing each file, it would have to spend approximately 36,500 hours, or 1,521 days,

22

which is the equivalent of over six employee work years (assuming there are 250 work days per

year). *Id.* This burden is not a reasonable one to impose upon OSHA.

In sum, the trade secrets contained in the database plaintiff requested are not reasonably

segregable from the other sampling data.[9]  Accordingly, DOL may withhold all the site-specific

sampling data (*i.e.*, all the employers' names and addresses) under exemption 4.

> iv.  Disclosure of either the inspection ID number, OSHA Office ID number, or the specific day on which an inspection occurred, could, combined with other publicly available information, permit identification of the employer that yielded the sample, thus disclosing trade secrets and/or confidential commercial information.

While disclosure of the employers' names and addresses is the most direct way of

revealing trade secrets and confidential commercial information, it is not the only way.  Certain

other information requested by plaintiff could, when combined with other publicly available

information, lead to the identification of the employers that yielded the samples at issue. *See*

*generally McDonnell Douglas Corp. v. United States Dep't of the Air Force*, 375 F.3d 1182, 1195

(D.C. 2004) (recognizing concept of "reverse engineering").  Specifically, disclosure of the

inspection ID number, the OSHA office ID number, or the exact day of the inspection presents

this risk.

Release of the inspection ID numbers or the specific days on which inspections occurred

would allow identification of the employer by cross-reference with the publicly available OSHA

inspection database on the OSHA website (http://www.osha.gov/oshstats/index.html).  Fairfax

decl., ¶ 17.  This database includes the inspection ID number and the employer inspected,

although it does not include sampling data.  The database also includes the date of inspection, and

---

[9] Because employers are permitted, but not required, to designate trade secrets, even a pain-staking search such as that described above would not guarantee discovery of all trade secrets. *See* 29 C.F.R. § 70.26(b); Exec. Order 12600.

therefore could be used to identify the employers subject to inspection on specific dates, *i.e.*, day, month and year. *Id.* DOL therefore properly withheld the inspections ID numbers and the specific days on which each inspection occurred.

Release of the OSHA office ID number could also allow, via cross-referencing, discovery of the identity of the employers that yielded the samples at issue in this case. *Id.* at ¶ 18. The OSHA office ID numbers are available on OSHA's public website (*see* URL, above), listed as "Report ID number" on individual inspection records. A FOIA request for a list of all inspections conducted by a particular OSHA office during a particular time period would provide the requester (and the public) with a list of employers that could be matched with the list of samples disclosed in this case. *Id.* Comparing the list of employers inspected by a particular OSHA office in a particular month and year to the list of samples taken in a particular month and year disclosed in this case, could – if the latter also contained the OSHA office ID number – allow the requester in many cases to reverse engineer which employers yielded which samples. *Id.*

Accordingly, DOL properly withheld under exemption 4 the inspection ID numbers, the specific days on which each inspection was conducted, and the ID number of the OSHA office that conducted each inspection.

### C.  DOL properly withheld CSHO ID numbers under FOIA exemptions 7(C), (E).

Exemption 7(C) permits an agency to withhold information contained in files compiled for "law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption 7(E) affords protection to law enforcement information that "would disclose techniques and procedures for law

24

enforcement investigations or prosecutions . . . ."  5 U.S.C. § 552(b)(7)(E).  Civil law

enforcement, including OSHA enforcement, qualifies as "law enforcement" within the meaning of

exemption 7.  *See, e.g., Cooper Cameron Corp. v. United States Dep't of Labor*, 280 F.3d 539,

545 (5th Cir. 2002) (OSHA inspection records are law enforcement records for purposes of

exemption 7).

### (i) DOL properly withheld CSHO ID numbers under exemption 7(C) to protect the personal privacy of its CSHOs.

To determine whether exemption 7(C) applies, the individual's privacy interest in

withholding the information must be weighed against the public interest in disclosing the

information.  *Reporters Comm.*, 489 U.S. at 762.  The identities of federal, state, and local law

enforcement personnel referenced in investigatory files are routinely withheld under exemption

7(C) to protect them from "harassment and annoyance in the conduct of their official duties and in

their private lives."  *Nix v. United States*, 572 F.2d 998, 1006 (4th Cir. 1978).  Absent proven,

significant misconduct, the identities of law enforcement personnel are exempt under 7(C).  *See,

e.g., Manna v. United States Dep't of Justice*, 51 F.3d 1158, 1166 (3d Cir. 1995); *Landano*, 956

F.2d at 426.

Individuals, including law enforcement personnel, have a privacy interest not only in their

names, but in personally identifying information.  *Rugiero v. United States Dep't of Justice*, 257

F.3d 534, 552 (6th Cir. 2001) (personally identifying information about Drug Enforcement Agency

investigators protected under 7(C)); *McDonnell v. United States*, 4 F.3d 1227, 1255 (3d Cir. 1993)

(exemption 7(C) protects "identities, or information relating to identities," of government investigators).

Each CSHO has a unique ID number.  Fairfax decl., ¶ 13.  OSHA uses these ID numbers strictly as an internal management tool for reviewing and assessing the work activities of CSHOs. *Id.*  For example, the CSHO ID numbers allow supervisors to monitor the amount of time each CSHO works; the OSHA safety and health standards each CSHO recommends for citations; and other work activities CSHOs perform, such as providing telephone assistance to the public. *Id.* By allowing OSHA supervisors to access the work performance of CSHOs, the ID numbers allow OSHA to evaluate the strengths and weaknesses of its CSHOs, which helps OSHA improve the quality of OSHA supervision and training programs for its CSHOs, and thereby improve the quality of CSHO inspections. *Id.*

CSHO ID numbers are an integral part of CSHOs' identities. *Id.* at ¶ 15.  A CSHO's identity could be discovered by someone intent on doing so if his CSHO ID number was known and could be tied with other publicly available information. *Id.*  For example, if a CSHO ID number is known, and is associated with particular inspections conducted on particular dates – as requested by plaintiff – the CSHO's identity could be deduced. *Id.*

Public knowledge of a CSHO's identity could lead to harassment of CSHOs on the job. Fairfax decl., ¶ 16.  Such harassment would constitute an "unwarranted invasion of personal privacy." *See Nix*, 572 F.2d at 1006 (exemption 7(C) protects law enforcement personnel against "harassment and annoyance in the conduct of their official duties and in their private lives."); *Hale v. United States Dep't of Justice*, 973 F.2d 894, 902 (10th Cir. 1992) (FBI employee ID numbers

26

exempt under 7(C), based on their potential to identify FBI employees), *vacated and remanded on other grounds*, 509 U.S. 918 (1993).

There is no countervailing public interest in the disclosure of CSHO ID numbers.  In *Reporters Comm.*, the Supreme Court made clear that, for FOIA purposes, "public interest" is limited to the public's right to be informed about the workings of its government.  489 U.S. at 773.  The identity of the requester and the purpose of the request are not relevant.  *Id.* at 771.  The test for "public interest" under FOIA is not whether there is a general interest in the information, such as the type of interest that may exist in celebrities, weather events, natural disasters, or high-profile litigation.  Rather, "the basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) (citations omitted).  CSHO ID numbers reveal nothing about government operations and activities.  They are useful merely for internal administrative purposes.  Therefore, there is no FOIA-recognized public interest in CSHO ID numbers to weigh against the countervailing privacy interest. *See, e.g., Hale*, 973 F.2d at 902 (FBI employee ID numbers are "matters of no genuine public interest"), *vacated and remanded on other grounds*, 509 U.S. 918 (1993).  Accordingly, DOL properly withheld CSHO ID numbers under exemption 7(C).

> (ii)  DOL properly withheld CSHO ID numbers under exemption 7(E) to preclude
> the compilation of CSHO profiles that would reveal techniques or procedures used
> for law enforcement investigations or prosecutions.

Exemption 7(E) provides an additional basis for withholding of CSHO ID numbers.  Disclosure of CSHO ID numbers could lead to computerized profiling of a CSHO's proclivities to cite particular violations or higher penalties.  Fairfax decl., ¶ 16.  Such profiles would disclose

"techniques or procedures for law enforcement investigations or prosecutions." *See* 5 U.S.C. § 552(b)(7)(E). The disclosure of CSHO techniques and procedures could enable employers to be less cooperative with, or deny entry to, certain CSHOs. Fairfax decl., ¶ 16. Accordingly, DOL properly withheld CSHO ID numbers under exemption 7(E).

### D. DOL properly withheld the "coded ID numbers" of OSHA employees who received the Beryllium Lymphocyte Proliferation Test (BeLPT).

FOIA exemption 6 protects information about individuals in "personnel and medical files and similar files" where disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). While exemption 6 generally provides less privacy protection than exemption 7(C), discussed above, a similar weighing of privacy interests versus public interests applies under exemption 6. *See, e.g., McDonnell*, 4 F.3d at 1253. DOL properly withheld under exemption 6 the "coded ID numbers" of OSHA employees who underwent the beryllium lymphocyte proliferation test (BeLPT) for beryllium sensitization.

The "coded ID numbers" requested by plaintiff are contained in medical files covered by exemption 6. Wright decl., ¶¶ 2, 3.[10] The BeLPT data indicates whether the OSHA employee tested positive or negative for beryllium sensitization. Wright decl., ¶¶ 2, 3. Thus, the privacy interest at issue is personal medical information. Additionally, the "coded ID numbers" of the OSHA employees that took the test consist of the last four digits of their Social Security numbers. *Id.* at ¶ 3. Thus, deducing the OSHA employee's identity from the "coded ID number" would not be difficult. *See* Fairfax decl., ¶ 14 (OSHA discontinued use of last four digits of CSHO's Social

---

[10] The medical records of the OSHA employees who underwent the BeLPT are covered by the Privacy Act, 5 U.S.C. § 552a, and therefore may not be disclosed unless disclosure is required under FOIA. 5 U.S.C. § 552a(b)(2).

Security number in formulating CSHO's ID number five years ago).  Disclosure of the "coded ID

numbers" associated with the BeLPT data therefore could result in discovery of the identities of

the individuals to whom the BeLPT data relates, and their personal medical information.

"It is beyond dispute that an individual has a substantial privacy interest in his or her

medical records." *McDonnell*, 4 F.3d at 1253.  Weighed against the privacy interest, there is no

public interest in disclosure of the "coded ID numbers" requested by plaintiff.  DOL has disclosed

to plaintiff how many OSHA employees took the BeLPT and how many had positive results.

There is no public interest in knowing the "coded ID numbers," or the identities, of the OSHA

employees who took the BeLPT.

DOL therefore properly withheld under exemption 6 the "coded ID numbers" of the OSHA

employees who received the BeLPT.

## CONCLUSION

For the foregoing reasons, DOL properly withheld portions of the records responsive to plaintiff's FOIA requests under exemptions 4, 7(C & E), and 6.  DOL therefore respectfully urges the Court to grant its motion for summary judgment.

<div style="margin-left: 50%;">

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
United States Attorney

</div>

By:    Susan Handler-Menahem
         Assistant U.S. Attorney

**EXHIBIT**

# THE ACME BRICK COMPANY

    

Kevin Ropp
Director
OSHA Office of Communications
Room N-3647
U.S. Department of Labor
200 Constitution Avenue, NW
Washington, DC 20210
FAX: (202) 693-1635

May 17, 2006

Ref; Adam M. Finkel v. U.S. Department of Labor, OSHA, No. 3:05-cv-05525-MLC-TJB. OSHA.  Comments on disclosure of all air sampling data that OSHA collected nationwide from 1979 to June 1, 2005.

Dear Mr. Ropp;

In response to the Department of Labor, OSHA request for comment, Acme Brick Company strongly objects to the disclosure of all air sampling data that OSHA has collected nationwide from 1979 to June 1, 2005.

The release of our sampling records located at OSHA's Salt Lake City Technical Center would allow our competitors and the public to have access to our confidential information.

We have spent 115 years developing our trade secrets on our product mixtures, raw materials, blends and additives that make up our finished goods. Disclosing the information requested under the Freedom of Information Act could jeopardize our competitive edge.

Acme Brick Company strongly opposes this request.

Sincerely,

Ed Watson
V.P. of Production